No. 38,274

In the Matter of the Estate of William A. Hurd, Deceased. (ANTHONY SHAY et al., *Appellants*, v. ARTHUR L. RISLEY et al., *Appellees*.)

(233 P. 2d 703)

Opinion filed July 3, 1951.

*Arvid Owsley*, of Kansas City, Mo., argued the cause and *J. N. Tincher, Clyde A. Raleigh*, and *J. N. Tincher, Jr.*, all of Hutchinson, were with him on the briefs for the appellants.

*William H. Burnett*, of Hutchinson, argued the cause and was on the briefs for the appellees.

The opinion of the court was delivered by

SMITH, J.: This was a proceeding to probate a will. The trial court ordered the will admitted. The opponents have appealed.

We do not have the pleadings before us. From what is said in the briefs, however, we gather the opponents, being some of the heirs at law of the testator, claimed that the testator was subjected to undue influence and lacked testamentary capacity. The testator was a farmer and unmarried. His heirs at law were nieces and nephews and grand nieces and nephews. He died on March 16, 1948. His estate consisted in the main of an eighty-acre farm and a quarter section. The trial court tells the story about as well as can be in its findings and conclusions. They are as follows:

"FINDINGS OF FACT AND CONCLUSIONS OF LAW

"FIRST. That William A. Hurd died at the age of 87, a resident of Reno County, Kansas, on March 16, 1948. That he was a bachelor and left surviving as his heirs at law certain nieces and nephews, a great-nephew and two great-great nephews.

"SECOND. That in his early years the deceased lived with his parents on a farm in McPherson County, Kansas; that when his father died he and his mother moved to Windom and lived there for some time, and then moved to a farm in Reno County near Nickerson, Kansas, and later they moved to a farm near Windom where they were living when his mother died. Later he moved back to the farm near Nickerson.

"THIRD. That there was a mortgage on the farm and during the years from 1937 to 1941 there were poor crops or none at all and he had a very hard time making the payments on the mortgage and paying the taxes, but the mortgage was finally paid off and from 1941 on he had sufficient income to meet all of his needs.

"FOURTH. That the eighty near Nickerson was rented to A. L. Risley, but there was a house and old barn there which were used by the deceased, and Mr. and Mrs. Risley made frequent trips to the farm and saw to it that he got along all right.

"FIFTH. That in December, 1947, the deceased became ill and was taken by the Risleys to their home in Nickerson where he remained until the time of his death.

"SIXTH. That Mr. Hurd was ill the latter part of December, 1946, and the first part of January, 1947, and his niece, Beatryce L. Frey, came from Oregon with her husband and found him improved, and after a short visit decided to take him to California for a trip. That the day before they left, at the request of Mr. Hurd they drove with him to Windom, Kansas, to see Mr. C. E. Lindell, and that while there the deceased had Mr. Lindell draw a will which he executed, and in which will he left all of his property to Beatryce L. Frey, and then went with the Freys to California. That he returned from California about five or six weeks later.

"SEVENTH. That in December, 1947, the deceased had Mr. Risley call Mr. Lindell and ask him to come to Nickerson to see him, which Mr. Lindell did, and at that time Mr. Hurd asked Mr. Lindell to pay his taxes for him which were then due, and Mr. Lindell did so.

"EIGHTH. That on the 21st day of January, 1948, Mr. Hurd again requested Mr. Risley to call Mr. Lindell and ask him to come to see him, which Mr. Lindell did, and came to the home of the Risleys where Mr. Hurd was then living, and that Mr. Lindell and Mr. Hurd there talked privately and Mr. Hurd requested that he draw a will leaving the eighty acres near Nickerson to Mrs. Risley and the rest of his estate to his nephew, Pearl McGuire. That Mr. Lindell then went to the drug store at Nickerson and borrowed a typewriter and drew the will offered for probate in this case, and then returned to the residence of the Risleys where the will was executed which was witnessed by Mr. Lindell, Mr. Owston and Mr. Warnock in the home of the Risleys. That Mr. Owston and Mr. Warnock were neighbors and were called in for the particular purpose of witnessing the execution of this will.

"NINTH. That Mr. Hurd could not read or write to any extent and was barely able to sign his name, and that when he signed the will the signature was poor and he crossed it out and wrote it again. That Mr. Hurd never used a pen and even had trouble signing with a pencil.

"TENTH. That Mr. Hurd was a man of strong will and of strong likes and dislikes and very secretive concerning his business matters, but seemingly he had complete trust in Mr. Lindell and whenever possible had Mr. Lindell handle his business affairs that he could not handle himself.

"ELEVENTH. That from December, 1947, to March 16, 1948, the deceased was being treated for his physical conditions by Dr. H. L. Graber of Nickerson, a medical doctor, and that on or about January 21, 1948, the doctor considered the deceased to be well oriented and to be keen and alert and well aware of all that was going on around him, and that his mind was quite normal for a man of his age and that he was able to make his own decisions.

"TWELFTH. That there is no evidence in this case to show that he was unable to know the extent of his property and of what it consisted or unable to know the natural objects of his bounty, and while he was old and his health was not of the best because of arteriosclerosis, yet he was in complete control of his mental faculties on January 21, 1948, at the time of the execution of this will.

"THIRTEENTH. That there is no evidence in this case to disclose the fact that there was any undue influence exerted upon the deceased by anyone at the time of the execution of this will, either by the Risleys or Mr. Lindell or by Pearl McGuire or anyone else.

"CONCLUSIONS OF LAW

"The Court concludes as a Matter of Law:

"FIRST. That the will offered for probate in the Probate Court of Reno County, Kansas, is the last will and testament of William A. Hurd, and that such will was duly, properly and regularly executed.

"SECOND. That at the time of the execution of this will the deceased was not under the influence of any person or persons, and that at the time of its execution and immediately prior thereto there was no undue influence exerted upon the deceased in the matter of the provisions of the will.

"THIRD. That at the time of the execution of the will in question the deceased had sufficient mental capacity to execute a good and proper will.

"FOURTH. That by reason of the above and foregoing the will offered for probate is the last will and testament of William A. Hurd and should be admitted to probate and its terms executed according to law."

The opponents' argument is in the main an attack on the findings of fact.

They first argue the trial court erred in ignoring the fact that evidence was lacking that the witnesses to the will attested it at the request of testator. This is not a correct statement of the record. The scrivener was a banker, an old friend of testator. He testified that he drew the will as instructed by testator; took it back out to testator's farm; read it to him; and that testator and witnesses signed it in the presence of each other. One witness to the will said he came in the room and the scrivener, the testator, and the other witness was there, and the scrivener said "we were there for the purpose of witnessing a will for Mr. Hurd." The scrivener said that Mr. Hurd signed the will in the presence of Lindell, Owston and Warnock and they all signed in the presence of each other.

If the trial court believed this testimony it was sufficient to establish that the will was properly executed. Especially is this true in the absence of any evidence to the contrary. Under this head opponents argue that the proponents of the will did not meet the burden of proving that the testator was acquainted with the provisions of his will when he was unable to read and write. The scrivener testified that the testator told him the disposition he wished to have made of the two farms; that he left the house and went to a drugstore and wrote the will and was back at the house within an hour and told testator he had drawn it the way he wanted it. There was not a scintilla of testimony to discredit this testimony of the scrivener and even if there were it is the duty of the trier of the facts to weigh evidence in the first instance. The scrivener testified—

"I talked with him about making the will when there was no one present but me and Mr. Hurd. He stated that he wanted the McPherson County farm to go to Pearl McGuire and the Reno County eighty acres to go to Mrs. Risley and the residence to Pearl McGuire. He stated that he didn't want Mrs. Frey to have anything to do with his property. . . . I went to the drug store, typed the will and returned it to the Risley home. Hurd signed the will at the dining room table in the Risley home, in the presence of Mr. Owston, Warnock and myself, and we witnessed the will. I did not know Mr. Owston or Mr. Warnock. We signed in the presence of Mr. Hurd and in the presence of each other."

That was sufficient.

The opponents next argue that the court erred in finding there was no evidence of any undue influence exerted upon the deceased at the time of the execution of the will. The main point in this argument is that the testator was living at the home of one of the opponents who was taking care of him at the time and took care of him at his last illness. The opponents point out that this person wrote to one of the opponents and discouraged this niece about coming to see her uncle, the testator. There was no evidence that he did anything actually to keep her from coming and no evidence that she could not have seen her uncle if she had come. The record is devoid of any influence being exercised upon the testator to make a will other than the way he wished.

The objectors next argue the court erred in not holding that the proponents failed to overcome a presumption that testator intended revocation when he drew lines through his signature. It is difficult for us to deal with that argument adequately due to the fact that the will was not furnished by the opponents. The only testimony as to lines being drawn was the signature and the scrivener testified the old gentleman was a poor writer; that he had trouble signing his name the first time and the scrivener asked him to write it over. The trial court evidently believed this testimony. Moreover the court had the will so it could be examined. On this point the scrivener testified as follows:

"In explanation of why the testator signed his name twice Lindell stated Hurd could write his signature, but he didn't read or write, except to sign his name and that he did such a bad job on the first signature, Lindell suggested he had better do it over because Lindell wanted it to look a little better so it would be clear who it was. Somebody might question it was his signature. The marks across Hurd's name may have been because he was nervous. He always had difficulty signing his name and Lindell thought Hurd was standing up."

This is a perfectly natural explanation of the argument about the signature and since the trial court believed it there is nothing further to be done.

The opponents next argue that the court erred in its proposed findings of fact as they are not within the evidence and the proposed conclusion of law based thereon, therefore, are erroneous. We have examined this record and find no evidence whatever that there was anything wrong about the manner in which this will was executed or that the testator was under undue influence.

The judgment of the lower court is affirmed.